## AFFIDAVIT

I, Jose Marin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1) I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic device and removable media listed in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2) There is probable cause to believe that a search of the device described herein and in Attachment A will lead to evidence of violations of **8 U.S.C. § 1324 – TRANSPORTATION OF ILLEGAL ALIENS FOR PROFIT & CONSPIRACY TO TRANSPORT ILLEGAL ALIENS FOR PROFIT**, as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3) The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation. As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the device.

4) I am a Border Patrol Agent with the United States Border Patrol (USBP) currently assigned to Tucson Sector in Tucson, Arizona. I have been an agent with the USBP since September 10, 2009. I completed the USBP Academy in December of 2009, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States. After I graduated from the academy, I served as a line agent and on various details. While performing line agent duties, I seized bulk narcotics and made numerous arrests of subjects whose cases were presented to the U.S. Attorney's Office (USAO) for prosecution. Thereafter, I was assigned to the Alien Smuggling Identification and Deterrence (ASID) Unit, where I identified, classified, and sought prosecution of human and drug traffickers operating in my station's area of responsibility. As a member of the ASID Unit, I conducted hundreds of interviews with suspects and witnesses, including illegal aliens, to gather information and present cases for prosecution. I am currently assigned the Tucson Sector Prosecutions Unit, where I work closely with federal prosecutors and multiple local and federal agencies to present cases for prosecution. In this role, I review numerous USBP reports regarding criminal activity occurring in the Tucson Sector, testify before the federal grand jury, and testify in multiple federal criminal trials. I act as a liaison between the USAO and field agents and assist fellow

agents in the development of their cases. Since becoming a Case Agent for the Tucson Sector Prosecution Unit, I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case.

5) Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and structure of human and contraband smuggling organizations. My responsibilities include conducting investigations into ASOs (Alien Smuggling Organizations), DTOs (Drug Trafficking Organizations) and individuals who derive substantial income from the illicit movement and distribution of humans and narcotics. As a United States Border Patrol Agent, I am responsible for investigating and enforcing violations of federal law to include the enforcement of various federal customs and immigration laws.

6) I have learned well-established ASOs along the southwest border routinely compartmentalize their illegal operations. These ASOs employ various sub organizations, which independently accomplish the receipt, transportation, housing, concealment of humans that are smuggled through the southwest border to destinations within the interior of the United States.

7) Importantly, I have learned that the ASOs utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, and drivers etc., is the most common form of communication. While using cell phones, ASOs often take, or cause to be taken, photographs and videos of themselves, individuals being smuggled, their associates, their property, such as vehicles and cash, and their narcotics/firearms. Smugglers usually maintain these photographs on their cellular phones, which they maintain dominion and control over.

8) ASOs will utilize several different applications (apps) and functions on their phones to facilitate the coordination of a smuggling event, and maintain constant communication with couriers/coconspirators, all the way from inception of the alien entering the United States to delivery of the alien at the desired location and payment.

9) ASOs often use text messages to coordinate between the individuals participating in any given smuggling event. The use of text is convenient because it is quiet, discreet, and can be read whenever it is opportune for whomever is receiving the message. Often, directions are sent via text or other apps. Other apps ASOs exploit may include Whats-App, WHISPER, and Facebook Messenger. The ASOs use these platforms because they are usually more difficult to track. These programs are also used to solicit and recruit for drivers, scouts, heat vehicles, and lookouts to fill roles in the scheme.

10) Apps are used to communicate during the commission of the crime. Scouts often relay the presence of Border Patrol to avoid detection. Drivers can be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. Often, payment for

these jobs is discussed on these platforms. Furthermore, it is common for drivers to communicate with co-conspirators (e.g. passenger accompanying and/or assisting driver) via text messages, direct calls, social media, or other applications when they discuss/plan routes of travel, monetary agreements, times, and locations. Sometimes the conspirators recruit the co-conspirator via social media.

11) This affidavit is based on information that is personally known by me or that I learned from other law enforcement agents. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

12) The purpose of this warrant is to search one **(1) Blue Samsung Phone, (Target Phone 1)**. The property to be searched is documented on **DHS forms 6051S No. 2024265500003501** GP Group 2, as **Line Item 003, Blue Samsung Phone with clear case**, belonging to the event **DGL2402000167**, as described in Attachment A. Target Phone 1 was recovered and seized from WILLIAMS, Dereck.

13) Target Phone 1 is currently in law enforcement custody and are being held at the Douglas Border Patrol Station's Seized Property Vault; 1608 S. Kings HWY Douglas, AZ 85607.

14) The applied-for warrant would authorize the forensic examination of Target Phone 1 for the purpose of identifying electronically stored data, as described in Attachment B.

## PROBABLE CAUSE

15) On February 9, 2024, at approximately 7:44 a.m., U.S. Border Patrol Agents (BPAs) conducted a vehicle stop near Mile Marker 376 on State Route 80 when they observed a 2022, Silver, Volkswagen Atlas that appeared heavily laden as it passed them. Prior to the stop, the Volkswagen Atlas was observed traveling in an area that is known to be used by Alien Smuggling Organizations (ASO's) to pick up undocumented non-citizens. When the BPAs got behind the vehicle to get a better view of the license plate and run a vehicle registration check, the vehicle swerved on the highway and nearly came to a complete stop in the center lane on State Route 80. BPAs activated their emergency lights in an attempt to conduct an inspection of the vehicle and its occupants, however, the vehicle proceeded to drive into a residential area.

16) When the vehicle came to a stop, BPAs observed four occupants flee from the Volkswagen Atlas. At that time, the driver, later identified as WILLIAMS, Dereck Wayne (USC, DOB: XX/XX/1990) and the passenger, later identified as FINKELSTEIN, Destiny Ann (USC, DOB: XX/XX/2003) remained in the vehicle along with a remaining rear passenger who was later determined to be an undocumented non-citizen. All subjects who fled the vehicle were eventually apprehended and identified as undocumented non-citizens. A total of five undocumented non-citizens were believed to be the occupants of the vehicle driven by

WILLIAMS. WILLIAMS and FINKELSTEIN were read their Miranda Rights, placed under arrest, and charged with 8 U.S.C. § 1324. Subsequent to the arrest of WILLIAMS and FINKLESTEIN, items were seized from their person. A blue, Samsung cellular phone was seized from WILLIAMS as per the information provided on Form G-166F (REPORT OF INVESTIGATION) and DHS FORM 6051 (CUSTODY RECEIPT for SEIZED PROPERTY and EVIDENCE).

17) In a Post-Miranda Interview, FINKELSTEIN explained that WILLIAMS asked her to join him on a trip to Douglas, AZ for "a run." He offered to pay her $1000 USD if she agreed. FINKELSTEIN said she was initially told by WILLIAMS that they were going to transport three people to Phoenix, AZ. However, FINKELSTEIN stated WILLIAMS later decided they would pick up five undocumented non-citizens instead of three. FINKELSTEIN indicated she was aware the people they were picking up were undocumented non-citizens. FINKELSTEIN said they picked up the five undocumented non-citizens in a remote area and that they ran out of the desert when WILLIAMS stopped the vehicle. FINKELSTEIN observed WILLIAMS sending and receiving text messages from his phone during their trip and agreed that WILLIAMS was likely receiving instructions, regarding the smuggling venture, via text.

18) FINKELSTEIN signed a consent to search form for her personal cellular device and indicated that she had exchanged texts with WILLIAMS when she agreed to join him on this trip in exchange for $1000 USD. A search of FINKELSTEIN's phone corroborated her statements where there were messages from a contact named "Dereck" discussing the amount of people to be smuggled, the payment, and the pickup location. *See Attachment C*.

19) A blue Samsung cellular phone (Serial # 356408512129359) was found in WILLIAMS' possession at the time he was arrested and charged with 8 U.S.C. § 1324.

20) Post-arrest interviews were also conducted with the undocumented non-citizens who were apprehended in this event. At least one of the subjects mentioned they were receiving instructions via telephone. Another subject indicated he crossed in a group with a foot guide. Based on my training and experience, I have learned it is common for foot guides to use cellular devices to communicate with the coordinators so that they know exactly where to take the groups of undocumented non-citizens to meet the pick-up vehicle.

21) The 2022 Silver, Volkswagen Atlas was searched by BPAs subsequent the arrest of WILLIAMS and FINKELSTEIN. Discovered during the search were 17 Grams of Marijuana, 10 Grams of HASH LIQUID (HASH OIL), THC Resin Vape Cartridge, and 18 rounds of .556 ammunition.

22) Based on the above, your Affiant believes that probable cause exists to search Target Phone 1 for the items set forth in Attachment B. Your Affiant believes that Target Phone 1 contains evidence relating to the commission of criminal offenses including transportation of illegal aliens for profit and conspiracy to transport illegal aliens for profit (8 U.S.C. § 1324).

4

## TECHNICAL TERMS

23) Based on my training and experience, I use the following technical terms to convey the following meanings:
    a. <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. <u>Digital camera</u>: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

    c. <u>Portable media player</u>: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

    d. <u>GPS</u>: A GPS navigation device uses the Global Positioning System (GPS) to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The

      GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. Most cell phones include GPS technology for determining the location of the device.

    e. <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

24) Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Phone 1 has the following capabilities: wireless telephone, internet access, email and instant messaging, digital camera, portable media player, and GPS navigation.

25) In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border scouts use phones to guide the groups to the pickup locations. This allows the guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26) Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information

described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

27) As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Target Phone 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on Target Phone 1:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

28) *Nature of examination*: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Phone 1 consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of Target Phone 1 to human inspection in order to determine whether it is evidence described by the warrant.

29) *Manner of execution*: Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical

7

intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30) The Target Phone 1 has been properly stored by the United States Department of Homeland Security. Due to the nature of wireless telephones, data contained within will remain uncorrupted when being stored for an extended period.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Target Phone 1 as described in Attachment A to seek the items described in Attachment B. I believe that Target Phone 1 contains evidence relating to the commission of a criminal offense, violations of 8 U.S.C. § 1324, and constitutes property designed for use, intended for use, or used in committing the aforementioned crime.

Respectfully submitted,

_____
Jose Marin, Border Patrol Agent
United States Border Patrol

Subscribed and sworn to before me telephonically,

on March 28th, 2024.

_____
ANGELA M. MARTINEZ
United States Magistrate Judge

8